## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

MARSHA SUBER,

      Plaintiff,

      v.

CANCER TREATMENT CENTERS OF
AMERICA GLOBAL, INC., *et al.*

      Defendants.

CIVIL ACTION NO.
3:21-cv-00003-TCB-RGV

## NON-FINAL REPORT AND RECOMMENDATION

Plaintiff Marsha Suber ("Suber") has filed a first amended complaint against Cancer Treatment Centers of America Global, Inc. ("CTCA"); Gyasi Chisley ("Chisley"); and Jonathan Watkins ("Watkins"), collectively referred to as "defendants," alleging claims of gender and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"); race discrimination in violation of 42 U.S.C. § 1981 ("§ 1981"); age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and seeking compensatory, punitive, and liquidated damages.  [Doc.

19].[1]  Defendants move to dismiss Suber's first amended complaint, [Doc. 20], which Suber opposes, [Doc. 26], and defendants have filed a reply in support of their motion, [Doc. 29].  For the reasons that follow, it is **RECOMMENDED** that defendants' motion to dismiss, [Doc. 20], be **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Suber, a 58-year-old Caucasian woman, [Doc. 19 ¶ 13], was formerly employed by CTCA, [id. ¶¶ 19-24]; see also [id. ¶ 99].[2]  Suber began her employment with CTCA in 2012 as the Manager of Inpatient Services, [id. ¶ 19], and between 2013 and 2018, she was promoted to several different positions within the company, including Director of Inpatient Services, [id. ¶ 20], Director of Quality and Risk Management, [id. ¶ 22], Assistant Vice President ("VP") for Patient Care Services, [id. ¶ 23], Assistant VP for Oncology Patient Services, [id. ¶ 24], and VP Oncology Services – Chief Nursing Officer ("CNO"), [id. ¶ 26].  In May

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] The factual background is taken from the pleadings and exhibits attached to the first amended complaint and does not constitute findings of fact by the Court.  See Owens v. Metro. Life Ins. Co., Civil Action No. 2:14-CV-00074-RWS, 2015 WL 1651125, at *3 (N.D. Ga. Apr. 14, 2015) (citation omitted) ("[D]ocuments attached to a complaint are considered part of the complaint.").

2

2019, CTCA hired defendant Chisley, an African American male, as Chief Executive Officer ("CEO").  [Id. ¶ 27].  In October 2019, CTCA and Chisley demoted David Kent ("Kent"), a Caucasian male, from his position as CEO of CTCA's "Atlanta location," [id. ¶¶ 25, 28], terminated Nancy Hesse ("Hesse"), a Caucasian female, from her position as CEO of the "Philadelphia location," [id. ¶ 29], and hired Watkins, an African American male under 40 years old, as "Regional President over the Atlanta and Philadelphia locations," [id. ¶ 30].  According to the first amended complaint, CTCA and Chisley also "replaced two (2) over forty (40) years of age Caucasian executives with an under forty (40) years of age African-American male" during October 2019.  [Id. ¶ 31].

In January 2020, Suber was promoted to Interim Chief Operating Officer ("COO"), "while continuing to serve as the CNO."  [Id. ¶ 32].  In her position as Interim COO/CNO, Suber was responsible for all CNO duties, [id. ¶ 33], as well as all COO duties, [id. ¶ 34], and reported to Watkins, [id. ¶ 35].  Suber alleges that she "satisfactorily performed her duties" while occupying the dual Interim COO/CNO role.  [Id. ¶ 36].  In early 2020, Anne Simelane ("Simelane"), CTCA's VP of Talent at the Atlanta location, who was "responsible for working with the recruiter to identify candidates and screening applicants for review by the Regional President and Executive Team," [id. ¶¶ 37-38], "screened applicants for the VP of Business Development position for presentation to [] Watkins and the

Executive Team," [id. ¶ 38].[3]   The two final candidates for the VP of Business Development position "were a young African-American male and an older white male," [id. ¶ 40], and the Executive Team recommended the older white male for the position "based on his better experience," [id. ¶ 41].  However, Simelane told Suber that Watkins "wanted to hire the younger black male" for the position, [id. ¶ 42], and that Simelane "had to convince [] Watkins not to hire the younger black male," [id. ¶ 43].

In May 2020, Watkins told Suber that "she was doing a good job in her role and to keep up the good work," [id. ¶ 44], but around the same time, Watkins also "made it clear to [] [Suber] that he would not hire her for the permanent position of COO," [id. ¶ 45], and that "she was only serving temporarily until he hired a new COO," [id. ¶ 46], because Watkins "wanted to hire an 'experienced and seasoned leader' for the COO position," [id. ¶ 47].  In June 2020, CTCA posted the COO position for the Atlanta location, [id. ¶ 48], and "[b]efore and during the time period the COO position was posted," Suber expressed interest "in being the permanent COO" to both Watkins and Simelane, [id. ¶ 49]; however, during that

_____

[3] In early 2020, the Atlanta office Executive Team consisted of Suber, Simelane, Dr. Alan Yahanda (Chief of Staff), Dr. Patricia Rich (Vice Chief of Staff), Ray Williams (VP of Government Affairs), Michael Schriks (VP of Operations), Andrew Caldwell (Chief Financial Officer), and Dr. Gary Bernstein ("Dr. Bernstein") (Chief Medical Officer).  [Doc. 19 ¶ 39].

4

same time period, Simelane "told [] [Suber] it would be a waste of time for her to apply for the COO position because [] Watkins would not hire her," as the permanent COO of CTCA's Atlanta location, [id. ¶ 50], and that Simelane "had been excluded from the screening process for the COO position by [] Watkins," [id. ¶ 52], as he "screened and selected the candidates to be interviewed for the COO position," while the COO position was posted, [id. ¶ 53].  Suber alleges that two of CTCA's former COOs Scott Walker ("Walker") and Kent, both Caucasian males, told Suber "that she was being groomed for COO as part of the company's succession plan," [id. ¶ 25], but she asserts that "it would have been futile for [] [her] to apply for the permanent COO position," based on her conversation with Watkins in May 2020 and various conversations with Simelane, [id. ¶ 51].

While the COO position was posted, Simelane told Suber that "Watkins posted to the executive calendars four (4) candidates for interviews without Simelane's knowledge, and to her surprise," [id. ¶ 54], and Simelane commented that "scheduling all black candidates did not look good," [id. ¶ 55].  Suber alleges that the four candidates "were all substantially younger candidates than [] [her], minorities," and included three males.  [Id. ¶ 56].  In July 2020, Watkins and the Executive Team interviewed three candidates for the COO position,[4] "all of whom

---

[4] When the candidates were interviewed in July 2020, Tom Goodall (VP of Business Development) was also a part of the Executive Team.  [Doc. 19 ¶ 57].

[were] under forty (40) years old, African-American, and two (2) of whom [were] males." [Id. ¶ 57]. Suber alleges that she was "completely depressed and humiliated that she was being included in the process for the selection of [the permanent] COO position, not included for consideration for the COO position, and that only inexperienced young African-American males were being considered by [] Watkins," [id. ¶ 58], and "because other employees were asking her why she was not remaining as the permanent COO," [id. ¶ 59].

Members of the Executive Team told "Watkins that none of the candidates were experienced and that there was no reason to hire a new COO," [id. ¶ 60], and that Watkins and Chisley "were intentionally hiring young inexperienced black males," [id. ¶ 63], but during Executive Team meetings, Watkins "insisted on hiring" John Baldwin ("Baldwin"), [id. ¶¶ 61-62], a 29-year-old African American male, [id. ¶ 69]. During one Executive Team meeting, Watkins texted Baldwin and then told the Executive Team that Baldwin could start in two weeks. [Id. ¶ 62].

During July 2020, Watkins hired Baldwin for the permanent COO position, [id. ¶ 69], which Chisley approved, [id. ¶ 72].[5] Suber alleges that prior to posting

---

[5] Suber alleges that she was better qualified for the permanent COO position than Baldwin, [id. ¶ 68], as she "[was] a 'seasoned and experienced leader,'" [id. ¶ 64 (internal marks omitted)], with thirty-seven years "in the medical profession, including executive management experience," [id. ¶ 66], whereas Baldwin had "[a]t best" seven years of professional experience and was not a "'seasoned and experienced leader,'" [id. ¶¶ 65, 67].

the COO position, Watkins contacted Baldwin about hiring him, [id. ¶ 70], and that Chisley and Watkins "deviated from the normal hiring process by screening and preselecting Baldwin for the position of COO," [id. ¶ 73].  Suber alleges that Chisley "has engaged in other deviations in the hiring process to intentionally hire under forty (40) year old African-American males," [id. ¶ 74], and that Chisley hired Trevor Brand ("Brand"), "an approximately thirty (30) year old African-American male for the COO position for the Arizona location," [id. ¶ 75], "without hiring him as an Interim" and "without posting and following the normal hiring process for selecting candidates," [id. ¶ 76].  After Baldwin was hired, Suber "was informed that she would not perform the COO duties and that all of her duties managing the outpatient clinical programs would be removed from her supervision and assigned to Baldwin." [Id. ¶ 77]. Suber alleges that she "possesses equal or higher qualifications" than Kent and Walker for the COO position, [id. ¶¶ 82, 88], yet she was paid less than both Kent and Walker "for performing similar duties to the duties performed" by both men, [id. ¶¶ 81, 85], and that defendants paid her "a total compensation package less than the compensation package paid to Baldwin for performing similar duties to the duties [she] performed," [id. ¶ 78], although the jobs she performed "require[d] equal skill, effort and responsibility" to the jobs performed by Baldwin, Kent, and Walker, [id.

¶¶ 79, 83, 86], and the jobs she performed "were performed under similar working conditions" to all three men when they served as COO, [id. ¶¶ 80, 84, 87].

Suber alleges that as a result of being denied the permanent COO position, and being removed from the Interim COO position, which was accomplished by "removing a substantial portion of her duties," she suffered "an extreme loss of prestige," [id. ¶¶ 89-90], which "caus[ed] her to take a four (4) year step backwards in her career," [id. ¶ 90]. Suber further alleges that "[d]efendants' actions caused [] [her] to become deflated, humiliated, and disrespected for all of her accomplishments with CTCA," [id. ¶ 91], which was exacerbated by the "many executives and directors express[ing] dismay" that Suber "was not allowed to remain in the COO role," [id. ¶ 92], and "ma[king] comments . . . that it was unbelievable how all the candidates were black, and how obvious it was what [d]efendants were doing," [id. ¶ 93]. Suber alleges that "[i]mmediately before her constructive discharge," she confided in a member of the Executive Team that she "[did not] think you [could] remove an old white lady and move in young black inexperienced males," [id. ¶ 94 (internal marks omitted)], and the member agreed with her perspective and "suggested that she discuss her concerns with Simelane," [id. ¶ 95]. Suber took the member's advice and expressed the same sentiment to Simelane, who "agreed with" Suber that the "optics looked really bad," but Suber alleges that Simelane encouraged her "not to bring the issues up in talking to"

8

Watkins, [id. ¶¶ 96-97], and that "Simelane failed to take any action to correct the unlawful injustice perpetuated against" Suber "by [d]efendants," [id. ¶ 98]. On August 14, 2020, Suber "resigned [from her position as CNO] because she could not return to work in the intolerable working conditions created by [d]efendants," which included, but was not limited to, "the denial of the promotion to COO, the demoted position, the lack of meaningful duties, the humility and embarrassment of being removed as Interim COO, and having the outpatient clinical programs removed from her supervision," [id. ¶ 99], and Suber alleges that these conditions were created by defendants and ultimately "intended to force [] [her] to resign," [id. ¶ 100].

Suber filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on November 18, 2020, [id. ¶ 110]; see also [Doc. 19-2], and she filed her original complaint against defendants in this Court on January 7, 2021, [Doc. 1]. The EEOC issued a Notice of Right to Sue on Suber's EEOC charge on March 16, 2021. [Doc. 19-1 at 2]; see also [Doc. 19 ¶ 112]. Suber then filed her first amended complaint against defendants in this Court on March 29, 2021, asserting claims of gender and race discrimination in violation of Title VII, race discrimination in violation of § 1981, age discrimination in violation of the ADEA, and unequal pay in violation of the EPA. [Doc. 19]. Defendants move to dismiss the amended complaint, [Doc. 20], which Suber

opposes, [Doc. 26], and defendants have filed a reply in support of their motion, [Doc. 29].  The pending motion, having been fully briefed, is now ripe for ruling.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of an action when the complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the Court must accept Suber's allegations as true and construe the first amended complaint in her favor. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993); Tapsoba v. Khiani Alpharetta, LLC, Civil Action No. 1:13–CV–1519–RWS, 2013 WL 4855255, at *1 (N.D. Ga. Sept. 11, 2013).[6]  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [the] plaintiff's obligation to provide the grounds of [her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v.

---

[6] "However, the court need not 'accept as true a legal conclusion couched as a factual allegation.'"  Smith v. Delta Air Lines, Inc., 422 F. Supp. 2d 1310, 1324 (N.D. Ga. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Twombly, 550 U.S. 544, 555 (2007) (last alteration in original) (citations and internal

marks omitted).

"Factual allegations must be enough to raise a right to relief above the

speculative level," id. (footnote and citation omitted), as the complaint must

contain "enough facts to state a claim to relief that is plausible on its face," id. at

570. "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant[s] [are] liable

for the misconduct alleged."   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Twombly, 550 U.S. at 556). The Supreme Court in Iqbal held:

> Two working principles underlie our decision in *Twombly*. First, the
> tenet that a court must accept as true all of the allegations contained
> in a complaint is inapplicable to legal conclusions. Threadbare
> recitals of the elements of a cause of action, supported by mere
> conclusory statements, do not suffice. . . . Rule 8 marks a notable and
> generous departure from the hypertechnical, code-pleading regime of
> a prior era, but it does not unlock the doors of discovery for a plaintiff
> armed with nothing more than conclusions. Second, only a complaint
> that states a plausible claim for relief survives a motion to dismiss. . .
> . [W]here the well-pleaded facts do not permit the court to infer more
> than the mere possibility of misconduct, the complaint has
> alleged—but it has not "show[n]"—"that the pleader is entitled to
> relief."

Id. at 678-79 (last alteration in original) (citations omitted); see also Evans v. Ga.

Dep't of Behav. Health & Developmental Disabilities, CV 415-103, 2018 WL

4610630, at *3 (S.D. Ga. Sept. 25, 2018) (alterations in original) (citation and internal

marks omitted) ("Although there is no probability requirement at the pleading stage, something beyond . . . mere possibility . . . must be alleged.").

"While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,'" Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 556), "[t]o state a plausible claim for relief, [] [Suber] must go beyond merely pleading the 'sheer possibility' of unlawful activity by [] defendant[s] and so must offer 'factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged,'" Stabb v. GMAC Mortg., LLC, 579 F. App'x 706, 708 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted). "Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law." Moore v. McCalla Raymer, LLC, 916 F. Supp. 2d 1332, 1342 (N.D. Ga. 2013), adopted at 1336 (citations and internal marks omitted); see also Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam) (citation omitted); Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted).

## III.   DISCUSSION

Defendants present several arguments in support of their motion to dismiss. [Docs. 20 & 29]. Defendants initially assert that Suber's first amended complaint should be dismissed as a shotgun complaint. [Doc. 20 at 2-3]. Defendants also

contend that Suber has failed to allege sufficient facts to state plausible claims of discrimination under Title VII, § 1981, and the ADEA, or any violation of the EPA, [id. at 3-8], arguing that there are various legal and factual shortcomings in Suber's first amended complaint, [id. at 8-22].   Suber opposes each of defendants' arguments and urges the Court to deny defendants' motion, or, in the alternative, grant her leave to amend her complaint, [Doc. 26], which defendants oppose, [Doc. 29 at 15].

**A.** **Shotgun Complaint**

Defendants initially argue that Suber's first amended complaint "amounts to nothing more than an impermissible 'shotgun pleading.'"   [Doc. 20 at 2].  In support of their argument, defendants cite Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313 (11th Cir. 2015), see [id. at 3], in which the Eleventh Circuit identified four "rough types or categories of shotgun pleadings" as follows:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.  The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the

defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.   The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

Weiland, 792 F. 3d at 1321-23 (footnotes omitted); see also Yeyille v. Miami Dade Cty. Pub. Schs., 643 F. App'x 882, 884 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted).

Defendants specifically assert that Suber's first amended complaint "is replete with conclusory allegations, contains no sufficiently specific factual allegations to permit [d]efendants to adequately respond and defend, and fails to designate which allegations go with which claims or which claims are made against which [d]efendants." [Doc. 20 at 8.  Defendants insist that Suber's first amended complaint falls under multiple categories of shotgun pleadings as described by the Eleventh Circuit because her amended complaint "contain[s] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before," [id. at 3 (internal marks omitted) (quoting Weiland, 792 F.3d at 1321)], and that it "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," [id. (internal marks omitted) (quoting Weiland, 792 F.3d at

1323)].  Defendants therefore contend that Suber's first amended complaint should be dismissed as a shotgun pleading.   [Id. at 2-3].  Suber responds that her first amended complaint is not a shotgun pleading and that she "has provided more than sufficient allegations stating a short and concise statement and placing [d]efendants on notice of her race, gender and age discrimination claims and her EPA claim."  [Doc. 26 at 5].

"A complaint that fails to articulate claims with sufficient clarity to allow [] defendant[s] to frame a responsive pleading constitutes a 'shotgun pleading.'" Lampkin-Asam v. Volusia Cty. Sch. Bd., 261 F. App'x 274, 277 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Schowalter v. Ridge, Civil Action No. 1:08-CV-0264-JOF, 2009 WL 812279, at *6 (N.D. Ga. Mar. 27, 2009) (noting that an example of a shotgun pleading is where a plaintiff "makes no effort to match specific defendants and specific facts with each cause of action").  The Eleventh Circuit "has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay." Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.9 (11th Cir. 2002) (citation omitted) (citing Byrne v. Nezhat, 261 F.3d 1075, 1128-34 (11th Cir. 2001), abrogated on other grounds by Douglas Asphalt Co. v. QORE, Inc., 657 F.3d 1146, 1151 (11th Cir. 2011); Magluta v. Samples, 256 F.3d, 1282, 1284-85 (11th Cir. 2001) (per curiam); Anderson v. Dist. Bd. of Trs. of Cent. Fl. Cmty.

<u>Coll.</u>, 77 F.3d 364, 366 (11th Cir. 1996)).  "[S]hotgun [] pleadings . . . impede the orderly, efficient, and economic disposition of disputes," <u>Ebrahimi v. City of Huntsville Bd. of Educ.</u>, 114 F.3d 162, 165 (11th Cir. 1997) (per curiam) (citations omitted), and detract from the Court's ability to effectively manage litigation and administer justice, <u>Byrne</u>, 261 F.3d at 1131.

While Suber's first amended complaint, [Doc. 19], "could plausibly be characterized as a shotgun complaint, it does not neatly fit under that rubric," <u>Andela v. Univ. of Miami</u>, 692 F. Supp. 2d 1356, 1370 (S.D. Fla. 2010), <u>aff'd in part</u>, 461 F. App'x 832 (11th Cir. 2012) (per curiam) (unpublished).  Although defendants are correct that each of Suber's claims in her first amended complaint "contain[s] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before," [Doc. 20 at 3 (internal marks omitted)], it adequately clarifies the allegations and claims being asserted against defendants, <u>see</u> [Doc. 19 ¶¶ 107-48].  That is, Suber specifies that her Title VII and ADEA claims are asserted only against CTCA, [<u>id.</u> ¶¶ 107-26, 133-41], while her § 1981 and EPA claims are asserted against all defendants, [<u>id.</u> ¶¶ 127-32, 142-48].  Since neither Title VII nor the ADEA authorizes suits against individuals, <u>see</u> <u>Canty v. Fry's Elecs., Inc.</u>, 736 F. Supp. 2d 1352, 1361 (N.D. Ga. 2010) (citations omitted) ("Title VII and the ADEA do not impose liability on individuals [for] discrimination in violation of these statutes.");

see also Albra v. Advan, Inc., 490 F.3d 826, 830 (11th Cir. 2007) (per curiam) (citation omitted); Williams v. Ala. Dep't of Corr., No. 4:12–CV–4043–KOB, 2014 WL 636977, at *7 (N.D. Ala. Feb. 18, 2014), aff'd, 649 F. App'x 925 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted); Bernstein v. Ga. Dep't of Educ., 970 F. Supp. 2d 1340, 1355 (N.D. Ga. 2013), adopted at 1347 (citations omitted), Suber's first amended complaint can reasonably be read to bring Title VII and ADEA claims against CTCA alone and §1981 and EPA claims against all defendants, clarifying any confusion caused by her inartful pleading of incorporating all preceding paragraphs of the amended complaint in each count. "While the Eleventh Circuit has made its disdain for 'shotgun' pleadings abundantly clear, dismissal of the complaint should be reserved for only the most egregious cases 'where it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" Amin v. Mercedes-Benz USA, LLC, 349 F. Supp. 3d 1338, 1350 (N.D. Ga. 2018) (emphasis and citations omitted). Although Suber's first amended complaint has not "been drafted in the clearest, most precise manner," it "does not rise to the egregious level of a shotgun pleading." Wackenhut Servs., Inc. v. Artman Studios, Inc., No. 08-80956-CIV, 2009 WL 3028308, at *2 (S.D. Fla. Sept. 17, 2009). In short, "[w]hile it is true that [Suber's first amended c]omplaint does incorporate by reference each allegation set forth in the preceding paragraphs, . . . the Court finds it implausible that [defendants

are] unable to ascertain the claims being lodged against [them] and the grounds upon which those claims rest," Amin, 349 F. Supp. 3d at 1351 (citation omitted), and therefore finds defendants' shotgun pleading argument unpersuasive and will address the merits of the arguments defendants have asserted with respect to Suber's claims.

**B.     Merits of Suber's Claims for Relief**

    **1.      Title VII, § 1981, and the ADEA**

Suber brings discrimination claims against defendants under Title VII, § 1981, and the ADEA.  [Doc. 19 ¶¶ 107-41].  Specifically, Suber alleges failure to promote and constructive discharge claims under each of these statutes.  See [id.].[7]

---

[7] To the extent Suber intended to assert a demotion claim, see [Doc. 19 at ¶ 89 (alleging Suber suffered an "extreme loss of prestige [due to defendants] removing her from the Interim COO position"); ¶ 99 (alleging defendants created "intolerable working conditions," including Suber's "demoted position [as CNO rather than Interim COO/CNO]"); ¶¶ 108, 118, 128, 134 (alleging defendants intentionally discriminated against Suber, in part, by demoting her from the Interim COO position in the Counts alleging discrimination under Title VII, § 1981, and the ADEA, i.e. Counts One through Four)], the Court finds that Suber has not alleged facts adequate to state an actionable claim since she was removed only from the Interim COO position, see [Doc. 19]; see also Garcia v. City of Grantville, Ga., No. 3:17-CV-169-TCB, 2019 WL 12420818, at *3 (N.D. Ga. Jan. 16, 2019) (explaining that removal from a temporary position did not constitute an actionable demotion); Espinoza v. San Benito Consol. Indep. Sch. Dist., Civil No. 1:14-CV-115, 2017 WL 4477343, at *10 (S.D. Tex. May 16, 2017), aff'd, 753 F. App'x 216 (5th Cir. 2018) (per curiam) (unpublished) (citation omitted) ("[T]he title of 'interim' implies that the position is temporary," and "[p]laintiffs have cited no case law to suggest that removal from an interim position could constitute an adverse employment action").  Accordingly, it is **RECOMMENDED** that any

Defendants assert that Suber fails to allege facts in her first amended complaint sufficient to support her claims under each statute, and thus, contend that these claims should be dismissed for failure to state any plausible claims for relief.  [Doc. 20 at 3-8].  Title VII makes it unlawful for a covered employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts[8] . . . as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  Where § 1981 is used as a remedy for employment discrimination, the elements required to establish a claim under § 1981 mirror those required for a Title VII claim.  Howard v. BP Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994) (citation omitted); Brown v. Am. Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) (citation omitted); Hale v. Mingledorff, Civil

---

demotion claim arising from Suber's first amended complaint be **DISMISSED** and no further discussion of this claim is warranted.

[8] "Make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  "Section 1981 thus prohibits a range of material adverse actions in private employment because of race."  Willmore-Cochran v. Wal-Mart Assocs., Inc., 919 F. Supp. 2d 1222, 1233 (N.D. Ala. 2013) (citation omitted).

Action No. 2:13-CV-0228-RWS, 2014 WL 7012772, at *11 (N.D. Ga. Dec. 11, 2014), adopted at *1 (citation and internal marks omitted) ("The analysis of a disparate treatment claim is the same whether that claim is brought under Title VII [or] § 1981[.]").   In addition, the ADEA prohibits an employer from "fail[ing] or refus[ing] to hire or [] discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." E.E.O.C. v. Darden Rests., Inc., 143 F. Supp. 3d 1274, 1279 (S.D. Fla. 2015) (citation omitted) (quoting 29 U.S.C § 623(a)(1)).   "The protected age group is 40 or older." Eldredge v. EDCare Mgmt., Inc., Nos. 13-61373-Civ, 12-61984, 2014 WL 590336, at *1 (S.D. Fla. Feb. 14, 2014) (citing 29 U.S.C. § 631(a)).

Although "'a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a *prima facie* case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),'" Liburd v. Bronx Leb. Hosp. Ctr., No. 07 Civ. 11316(HB), 2008 WL 3861352, at *4 (S.D.N.Y. Aug. 19, 2008) (first alteration in original) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002)), "a complaint that 'provides no . . . detail manifesting any form of [discriminatory] animus, discriminatory words, prior incidents or other indications that [Suber's protected class] played a role in [the employer's adverse action]' is insufficient to satisfy the minimum pleading

standards of Rule 8(a)(2)," id., at *5 (first alteration in original) (citation omitted) (quoting Perry v. Sony Music, 462 F. Supp. 2d 518, 520 (S.D.N.Y. 2006)); see also E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273 (11th Cir. 2000) (alteration in original) (citation and internal marks omitted) ("In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group"); Givens v. Eddie Deen & Co. Catering, Civil Action No. 3:10-CV-1164-L, 2011 WL 624071, at *1 (N.D. Tex. Feb. 18, 2011) (emphasis omitted) ("A simple statement that Plaintiff believes [she suffered an adverse action] because [of her protected trait] is insufficient to plead a claim of [] discrimination under Rule 8 of the Federal Rules of Civil Procedure"). In short, "complaints alleging discrimination still must meet the 'plausibility standard' of Twombly and Iqbal." Henderson v. JP Morgan Chase Bank, N.A., 436 F. App'x 935, 937 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).

### a. Failure to Promote Claims

Suber alleges that defendants discriminated against her on the basis of her gender, race, and age when she was not promoted to the position of COO and instead made only an Interim COO/CNO and was dissuaded from applying for the permanent COO position because she was told it would be futile as she would not be considered and instead a younger, African American male with

substantially less years of experience was selected for the position.  See [Doc. 19].

Although Suber is not required to plead facts that establish a prima face case of

failure to promote to survive a motion to dismiss, the elements of a prima facie

case of discrimination are "a useful guide" in evaluating the sufficiency of the

allegations of her first amended complaint in view of defendants' arguments for

dismissal.  Ogidi-Gbegbaje v. W. Express, CIVIL ACTION FILE NO. 1:17-CV-

00936-WSD-JFK, 2017 WL 9477692, at *3 (N.D. Ga. Aug. 18, 2017), adopted by 2017

WL 4402168, at *3 (N.D. Ga. Oct. 4, 2017) (citations and internal marks omitted).

To establish a prima facie case of discriminatory failure to promote, Suber must

show "'(1) that [s]he is a member of a protected class; (2) that [s]he was qualified

for and applied for the promotion; (3) that [s]he was rejected; and (4) that other

equally or less qualified employees who were not members of the protected class

were promoted.'"  Smith v. Thomasville Ga., 753 F. App'x 675, 689 (11th Cir. 2018)

(per curiam) (unpublished) (quoting Combs v. Plantation Patterns, 106 F.3d 1519,

1539 n.11 (11th Cir. 1997)).  Defendants dispute that Suber has adequately alleged

several of these elements, see [Doc. 20], and the Court will address these

arguments, but finds that Suber has adequately pleaded facts to state plausible

failure to promote claims on the basis of her gender, race, and age against CTCA

with respect to her Title VII, § 1981, and ADEA claims and also as to Watkins with

respect to her § 1981 claim, but not as to Chisley.

22

In her response to defendants' motion to dismiss, Suber asserts that her discriminatory failure to promote claims are based on two legal theories – deviation from an alleged succession plan and the futile gesture doctrine – and she maintains that she has plausibly stated failure to promote claims under both theories, despite defendants' arguments to the contrary. [Doc. 26 at 16-23]. Suber explains that her "first promotional claim is based on [d]efendants' failure to promote her to COO in accordance with the succession plan," [id. at 17], which Suber alleges was established when Kent and Walker, former COOs of CTCA, told Suber "she was being groomed for COO as part of the company's succession plan," [id. (citation omitted)]. Under this theory, Suber argues that Chisley and Watkins "deviated from the normal succession plan that was in place and failed to promote [] [her] to COO in accordance with the succession plan." [Id.]. As for the second basis of her failure to promote claims, Suber contends that she "can establish a prima facie case of discrimination without having applied for the position under the futile gesture doctrine" because she "has specifically pled allegations establishing that it would have been futile for her to apply for the COO position once it was posted" as "she had a justifiable belief that [d]efendants' discriminatory practices made appl[ying to the permanent COO position] a futile gesture." [Id. at 17-18 (emphasis and citations omitted)].

The Court will first address the parties' arguments regarding the futile gesture doctrine, as it finds that Suber has sufficiently pleaded plausible claims for failure to promote against CTCA and Watkins under this theory.   Defendants argue that Suber has failed to state a plausible claim for failure to promote because she never applied for the COO position.   However, under the futile gesture doctrine, "a non-applicant may nonetheless establish a prima facie case by showing that she refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1274 (11th Cir. 2002) (per curiam) (citing Taylor v. Hudson Pulp & Paper Corp., 788 F.2d 1455, 1462 (11th Cir. 1986); Hailes v. United Air Lines, 464 F.2d 1006, 1008 (5th Cir. 1972)[9]).   "To demonstrate a 'justifiable belief,' [Suber] must show: '(1) that she had a real and present interest in the job for which [defendants were] seeking applications; and (2) that she would have applied for the job but effectively was deterred from doing so by [defendants'] discriminatory practices.'" Boyd v. Honda Mfg. of Ala., LLC, No. 1:08-CV-960-VEH, 2010 WL 6084741, at *8 (N.D. Ala. Dec. 16, 2010) (citation omitted).   "This showing usually consists of the applicant evincing that [she] was

---

[9] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.   Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

deterred from applying by 'a known and consistently enforced policy of discrimination,'" Williams v. Alpharetta Transfer Station, LLC, CIVIL ACTION NO. 1:07-CV-1949-GET, 2010 WL 11526841, at *2 (N.D. Ga. June 15, 2010), aff'd sub nom. Williams v. Waste Mgmt., Inc., 411 F. App'x 226 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted), and "[c]ourts, generally, have maintained a high bar for establishing futility," Bryant v. Jones, 696 F. Supp. 2d 1313, 1328 (N.D. Ga. 2010) (citation omitted).

The first factor to be considered in determining whether Suber had a "justifiable belief" under the futile gesture doctrine is whether Suber had "a real and present interest in the job for which the employer was seeking applications." Joe's Stone Crabs, Inc., 296 F.3d at 1274 (citation omitted).  In her first amended complaint, Suber alleges that "[b]efore and during the time period the COO position was posted," she told both Watkins and Simelane that she was interested in being CTCA's permanent COO, [Doc. 19 ¶ 49], but Watkins told Suber that she was only serving in the COO position temporarily because he would not hire her for the permanent COO position, [id. ¶¶ 45-46], and Simelane told Suber it would be "a waste of time for her to apply" as Simelane knew that Watkins wanted to hire a younger, African American male, [id. ¶ 50]. "Accepting [Suber's allegations] as true and construing them in [her] favor, as the Court must on a motion to dismiss," Kennebrew v. Cobb Cty. Sch. Dist., CIVIL ACTION FILE NO. 1:15-cv-

02495-RWS-CMS, 2016 WL 1569118, at *5 (N.D. Ga. Mar. 17, 2016), adopted by 2016 WL 1557224, at *1 (N.D. Ga. Apr. 18, 2016), the allegations of the first amended complaint are sufficient to support her claim that she had a real and present interest in the permanent COO position.

The second factor the Court must consider under this analysis is whether Suber "would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." Joe's Stone Crabs, Inc., 296 F.3d at 1274 (citation omitted). "The Supreme Court has characterized the types of discriminatory practices that render an application futile; they are 'the most entrenched forms of discrimination' that will 'deter job applications from members of minority groups.'" Williams, 411 F. App'x at 228–29 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 367 (1977)). Suber contends that the facts alleged in her first amended complaint and all reasonable inferences drawn from those allegations are adequate to support her argument that defendants engaged in "discriminatory employment practices." [Doc. 26 at 22]. In particular, Suber alleges that Simelane, CTCA's VP of Talent at the Atlanta location, who "[was] responsible for working with the recruiter to identify candidates and screening applicants for review by the Regional President and Executive Team," [Doc. 19 ¶ 37], told Suber that it would be a "waste of time for [Suber] to apply for the COO position because Watkins would not hire [Suber],"

26

[id. ¶ 50], which Suber argues supports "the reasonable inference . . . that [] [Suber] discussed applying[ for the permanent COO position,] and would have applied, but she was deterred from doing so," [Doc. 26 at 20]. Suber also asserts that "[d]uring this same time frame . . . Simelane explained her reasons to [] [Suber] as to why she should not apply by discussing the hiring process for the [VP] of Business Development [] position." [Id. (citation omitted)]. Suber explains that despite the Executive Team recommending the older white male candidate for the position, Simelane had to convince Watkins not to hire the younger African American male candidate. [Id. at 20-21 (citations omitted)]. Suber also asserts that "during th[e same] time period, Simelane told [Suber] about deviations [] Watkins was engaging in the normal hiring process," including that Simelane had been excluded from the screening process for the COO position by Watkins, that Watkins screened and selected the candidates to be interviewed for the permanent COO position himself, that Watkins posted four candidates to be interviewed for the permanent COO position to the executive calendar without Simelane's knowledge, and that it was not a good look that all the candidates scheduled to interview for the permanent COO position were African American. [Id. at 21-22 (citations omitted)]. Suber further asserts that CTCA and Chisley demoting Kent, a Caucasian male over 40 years old, from his position as CEO of the Atlanta location and terminating Hesse, a Caucasian female over 40 years old, from her

position as CEO of the Philadelphia location, while later hiring Watkins, an African American male under 40 years old, as the Regional President over the Atlanta and Philadelphia locations, and hiring Brand, a 30-year-old African American male, to be the COO of CTCA's Arizona location without hiring him as an Interim COO and without posting and following the normal hiring process for selecting candidates, illustrates that defendants replaced two Caucasian executives over 40 years old with an African American executive under 40 years old and supports her allegations that defendants were engaged in discriminatory employment practices.  [Id. at 22-23 (citations omitted)].  Suber ultimately argues that these allegations and "all reasonable inferences" that flow from them suggest that "[Suber] was deterred from applying [for the permanent COO position] because of [d]efendants' discriminatory employment practices."  [Id. at 22].  At this stage of the proceedings, construing the allegations of the first amended complaint and all reasonable inferences therefrom in Suber's favor, the Court finds that she has adequately alleged facts to plausibly support that she "would have applied for the job but effectively was deterred from doing so by the employer's [alleged] discriminatory practices," Joe's Stone Crabs, Inc., 296 F.3d at 1274 (citation omitted).  Thus, defendants' argument that Suber's failure to promote claim should be dismissed because she did not apply for the COO position is unpersuasive because she does not have to establish the elements of a prima facie

case in her first amended complaint, and even if she did, her allegations are sufficient at this stage of the proceedings to plausibly support the futile gesture doctrine.[10]

Defendants' other arguments about Suber's failure to promote claims merit less discussion. First, defendants assert that "[Suber]'s claim of discriminatory failure to promote must be dismissed because the same person who chose her to fill the interim COO position in January 2020, is also the same person who told her only a few months later that he would not hire her to fill the permanent COO position," [Doc. 20 at 12 (emphasis omitted)], which defendants argue "negat[es] any reasonable inference that either of [Watkins'] decisions were motivated by racial, gender, or age discrimination," [id.]. However, defendants' reliance on the same actor defense in support of their motion to dismiss is misplaced because, as

---

[10] As for Suber's succession theory, her first amended complaint fails to disclose an adequate factual basis to support her failure to promote claims under this theory, which she advances in response to defendants' motion to dismiss, but it is well settled that a complaint may not be amended by arguments in a brief. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) (citation omitted) ("A plaintiff may not amend her complaint through argument in a brief[.]"). While the first amended complaint includes an allegation that at some unspecified point in time during Suber's employment, former COOs Walker and Kent told her "that she was being groomed for COO as part of the company's succession plan," [Doc. 19 ¶ 25], the first amended complaint is devoid of any other factual allegations that plausibly suggest there was a succession plan in place at CTCA for Suber to become COO at the time she became the Interim COO/CNO or that Chisley and Watkins deviated from such a succession plan, see generally [Doc. 19].

Suber points out, <u>see</u> [Doc. 26 at 13-14], "'[s]ame actor' evidence . . . constitutes evidence that a jury may consider in deciding the ultimate issue of intentional discrimination," <u>Williams v. Vitro Servs. Corp.</u>, 144 F.3d 1438, 1443 (11th Cir. 1998), and each case from the Eleventh Circuit cited by defendants in their "same actor" argument was decided on summary judgment, <u>see</u> [Doc. 20 at 8-12].  In contrast, Suber's burden at the present stage of the proceedings is only to allege facts sufficient to plausibly support her claim, <u>Alexander-Igbani v. Dekalb Cty. Sch. Dist.</u>, Civil Action No. 1:11–CV–4535–AT–JSA, 2012 WL 9508020, at *7 (N.D. Ga. Dec. 21, 2012), adopted at *1 ("For purposes of [d]efendant's [m]otion to [d]ismiss[ ], the Court need only determine whether [p]laintiff's allegations state a plausible basis upon which to assert a claim[.]").  "The test of the sufficiency of a complaint is not whether it has alleged with precision everything the plaintiff will have to prove in order to prevail at trial." <u>Petrandis v. ZF Marine, LLC</u>, Case No. 4:06cv564-RH/WCS, 2007 WL 9735278, at *1 (N.D. Fla. Feb. 9, 2007).  Therefore, defendants' arguments based on the same actor defense are better suited for summary judgment or trial and unpersuasive to support dismissal of Suber's first amended complaint.

Next, defendants argue that Suber's first amended complaint is "littered with singularly conclusory allegations," including allegations with respect to her qualifications as compared to Baldwin's pertaining to her failure to promote claim.

[Doc. 20 at 4].  However, Suber specifically alleges that she has 37 years of experience in the medical profession and received several promotions during her tenure at CTCA, [Doc. 19 ¶¶ 20-27, 66], including being selected as the Interim COO/CNO, and that she received positive feedback from Watkins, her immediate supervisor, on her performance as Interim COO, [id. ¶¶ 32, 44], yet Watkins told her he was not going to hire her as CTCA's permanent COO, [id. ¶ 45], and defendants instead hired Baldwin, a younger African American male, to be the permanent COO, even though Baldwin had only seven years of professional experience, [id. ¶¶ 67, 69].  "Accepting [Suber's allegations] as true and construing them in [her] favor, as the Court must on a motion to dismiss," Kennebrew, 2016 WL 1569118, at *5, these allegations are sufficient to state the relative qualifications of Suber and Baldwin at this stage of the proceedings to plausibly support her failure to promote claims, see Boyd v. Medtronic, PLC, 2:17-cv-01588-LSC, 2018 WL 1964572, at *4 (N.D. Ala. Apr. 26, 2018).

Defendants also argue that Suber's claims under the ADEA are legally insufficient because Suber "fails to plead that [her] age was the 'but for' reason for any adverse employment action against her," [Doc. 20 at 21 (emphasis omitted)], which is required to bring a claim under the ADEA, see Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180 (2009).  Defendants contend that Suber's first amended complaint "explicitly negates the legally required pleading precisely because it

claims not only age as the alleged cause, but also race and gender as two of the three alleged causes for the alleged discrimination." [Doc. 20 at 22 (emphasis omitted)]. However, as Suber correctly points out, see [Doc. 26 at 28-29], "Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims," United Techs. Corp. v. Mazer, 556 F.3d 1260, 1273 (11th Cir. 2009) (footnote omitted). Although Gross may ultimately limit Suber's case at trial, "it does not preclude [her] from pleading alternative theories of relief." Collins v. Fulton Cty. Sch. Dist., Civil Action No. 1:12-CV-1299-ODE-JSA, 2012 WL 7802745, at *17 (N.D. Ga. Dec. 26, 2012), adopted as modified, 2013 WL 12177006, at *5 (N.D. Ga. Feb. 27, 2013). Accordingly, defendants' "but for" argument is unpersuasive.

Finally, the Court does find persuasive defendants' argument that the § 1981 claim against Chisley should be dismissed because Suber's first amended complaint fails to "contain any allegation that Chisley took any action against [her]." [Doc. 20 at 6 (emphasis omitted)].[11] In her first amended complaint, Suber

---

[11] Defendants make a similar argument for dismissal of the § 1981 claim against Watkins, see [Doc. 20 at 7], but the allegations of Suber's first amended complaint directly implicate Watkins as the decision-maker in the alleged discriminatory failure to promote Suber to the permanent COO position, and these allegations are sufficient to support the § 1981 claim against him, whereas the absence of similar allegations against Chisley vis-à-vis any adverse action against Suber renders the § 1981 claim against Chisely subject to dismissal for the reasons stated herein.

alleges that Chisley became CEO in May 2019, [Doc. 19 ¶ 27]; demoted Kent from a CEO position in Atlanta, terminated Hesse from a CEO position in Philadelphia, and hired Watkins, a younger African American male, as Regional President of the Atlanta and Philadelphia offices, and in so doing, replaced two Caucasian executives who were over forty years old, [id. ¶¶ 28-31]; approved of Watkins' hiring Baldwin, [id. ¶ 72]; deviated from the normal hiring process regarding Baldwin, [id. ¶ 73]; and hired Brand as the COO of CTCA's Arizona location, [id. ¶ 75].  Defendants contend that these allegations "[n]ever indicate that Chisley himself did anything whatsoever to [Suber], or to [Suber]'s compensation, or to [Suber]'s position, or to [Suber]'s continued employment," or in any other way acted against Suber "because of race, gender, or age."  [Doc. 20 at 6-7 (emphasis omitted)].  Thus, defendants argue that Suber fails to allege sufficient facts to state a plausible § 1981 claim against him.  See [id. at 6-8].  The Court agrees.

The closest Suber comes to alleging that Chisley had any connection to the failure to promote her to the permanent COO position is that he approved Watkins' selection of Baldwin for the position, [Doc. 19 ¶ 72], but this bare allegation that he approved the selection of another individual offers no plausible factual basis for concluding that he intentionally discriminated against Suber on the basis of her race, particularly since she did not apply for the position and Chisley is not alleged to have said anything to Suber that dissuaded her from

applying.[12]   Even after "[a]ccepting [Suber's] facts as true and [liberally] construing them in [her] favor, as the Court must on a motion to dismiss," Kennebrew, 2016 WL 1569118, at *5, the Court is hard pressed to conclude that Suber's allegations regarding Chisley are "enough to raise a right to relief above the speculative level." E.E.O.C. v. J & R Baker Farms, LLC, Civil Action No. 7:14-CV-136 (HL), 2015 WL 4753812, at *3 (M.D. Ga. Aug. 11, 2015) (citation and internal marks omitted).  Rather, as defendants point out, Suber has failed to allege facts to plausibly support that Chisley took any adverse action against her, which renders Suber's first amended complaint "insufficient to satisfy the minimum pleading standards of Rule 8(a)(2)." Liburd, 2008 WL 3861352, at *5 (citations omitted); see also Joe's Stone Crab Inc., 220 F.3d at 1273 (alteration in original) (citation and internal marks omitted) ("In order to show discriminatory intent, a plaintiff must

---

[12] For the reasons previously discussed, to the extent Suber relies on the succession theory to support her § 1981 claim against Chisley, the allegations of the first amended complaint do not support a plausible claim on this basis.  Similarly, the employment actions that Chisley took at other times and different locations as alleged in the first amended complaint do not support a plausible § 1981 claim against him with respect to Suber's non-selection for the COO position since the first amended complaint is devoid of any allegation that Chisley had a role in not selecting her for the position or influenced that decision.  See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) (noting that any alleged discriminatory intent harbored by a non-decisionmaker is irrelevant to liability for adverse employment action); Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990) (citations omitted) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.").

demonstrate that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group").   Accordingly, "[b]ecause 'the pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation,' [Suber]'s conclusory allegation that [Chisley] acted with racial animus [is] insufficient to state a plausible claim [under § 1981]."   Mondy v. Boulee, 805 F. App'x 939, 942 (11th Cir. 2020) (per curiam) (unpublished) (second alteration in original) (quoting Iqbal, 556 U.S. at 678) (affirming district court's dismissal of plaintiff's complaint where plaintiff "failed to support a plausible inference of racial discrimination [under § 1981]").   Thus, it is **RECOMMENDED** that defendants' motion to dismiss, [Doc. 20], be **GRANTED** as it pertains to Suber's § 1981 claim against Chisley but **DENIED** as to her failure to promote claims against CTCA and Watkins.

### b. *Constructive Discharge Claims*

Suber's first amended complaint includes claims of constructive discharge asserted under Title VII, § 1981, and the ADEA.  [Doc. 19 ¶¶ 108, 118, 128, 134]. "'Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job.'"  Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations omitted).  "The Eleventh Circuit has observed that the standard for proving constructive discharge

is higher than the standard for proving a hostile work environment."[13] Anaga-Nwoke v. Lockheed Martin Corp., CIVIL ACTION NO. 1:18-CV-0254-LMM-JSA, 2018 WL 8368660, at *5 (N.D. Ga. Apr. 30, 2018), adopted by 2018 WL 8368849, at *1 (N.D. Ga. May 22, 2018) (citation and internal marks omitted).  "Thus, a plaintiff who alleges constructive discharge must show more than just a Title VII violation." Id. (citation omitted).  Instead, "[a] plaintiff claiming constructive discharge must show a greater severity or pervasiveness of harassment such that resignation is the only reasonable response." Id. (citation and internal marks omitted).  That is, "[t]here must be a high degree of deterioration in an employee's working conditions, approaching the level of intolerable." Id. (citation and internal marks omitted).  And, while an isolated episode can form the basis of a constructive discharge, "for that to be the case, the episode must be a particularly high severity." Id.  Furthermore, "[c]onstructive discharge is difficult to show if the supposedly 'intolerable' conditions lasted only for a short time," and it "will generally not be found if the employer is not given sufficient time to remedy the

---

[13] "Unlike a hostile work environment claim, which considers a plaintiff's subjective feelings and objective factors, a constructive discharge claim involves only an objective standard." McWhorter v. Kindercare Learning Ctrs., LLC, Civil Action File No. 1:11–CV–04447–TWT–GGB, 2012 WL 2513502, at *5 (N.D. Ga. May 31, 2012), adopted by 2012 WL 2504010, at *1 (N.D. Ga. June 27, 2012) (citations omitted).

situation." Jones v. USA Petroleum Corp., 20 F. Supp. 2d 1379, 1383 (S.D. Ga. 1998) (citations and internal marks omitted).

Defendants contend that Suber fails to allege facts sufficient to support her constructive discharge claims because "[i]t is certainly not intolerable for an interim position to come to an end when the permanent position is filled," and "it is [not] intolerable for [Suber] to return to the highest nursing position in the Hospital (CNO), earning $200,000 per year, which is the same position [Suber] held for one year nine months from November, 2018, through August, 2020, when she resigned." [Doc. 20 at 19-20 (citation omitted)].  Defendants also assert that Suber serving as Interim COO for six months prior to the permanent COO position being posted in June 2020 and continuing to serve as CTCA's full-time CNO for another month after Baldwin was hired in July 2020 "clearly indicat[es] that she did not find [her working conditions] 'intolerable.'"  [Id. at 20].  In addition, defendants argue that "it is frankly non-sensical" for Suber to allege that her CNO position lacked any meaningful duties as she fulfilled the CNO role from November 2018 through January 2020 and continued to fulfill the CNO role while serving as the Interim COO from January 2020 until she resigned in August 2020. [Id.].  Moreover, defendants assert that even after Baldwin was hired to serve as CTCA's permanent COO, Suber was still "responsible for all inpatient clinical services."  [Id. at 21 (emphasis omitted)].  Suber reponds that her first amended

37

complaint "provides the details and totality of the [intolerable and] continuous circumstances that [] [she] was enduring and the failure to get any relief from [d]efendants when she complained."  [Doc. 26 at 26].  Suber contends that at this early stage in the litigation, her "allegations establish a progression of events that would cause a reasonable person to resign."  [Id. at 28].

Suber alleges that after Baldwin was hired as the permanent COO in July 2020, [Doc. 19 ¶¶ 69, 72], she "resigned [from her position as CNO in August 2020] because she could not return to work in the intolerable [] conditions created by [d]efendants," which included, but was not limited to, "the denial of the promotion to COO, the demoted position [as CTCA's full-time CNO], the lack of any meaningful duties [as CTCA's full-time CNO], the humility and embarrassment of being removed as Interim COO, and having the outpatient clinical programs removed from her supervision," [id. ¶ 99], and that these conditions were ultimately "intended to force [] [her] to resign," [id. ¶ 100].  Suber also alleges that as a result of being denied the permanent COO position and being removed from the Interim COO position, which was accomplished by "removing a substantial portion of her duties," she suffered "an extreme loss of prestige," [id. ¶¶ 89-90], which "caus[ed] her to take a four (4) year step backwards in her career," [id. ¶ 90], while also alleging that "[d]efendants' actions caused [] [her] to become deflated, humiliated, and disrespected for all of her accomplishments with

CTCA," [id. ¶ 91], which was exacerbated by the "many executives and directors express[ing] dismay" that Suber "was not allowed to remain in the COO role," [id. ¶ 92], and "ma[king] comments . . . that it was unbelievable how all the candidates were black, and how obvious it was what [d]efendants were doing," [id. ¶ 93].

Since, "[u]nlike a hostile work environment claim, which considers a plaintiff's subjective feelings and objective factors, a constructive discharge claim involves only an objective standard," McWhorter, 2012 WL 2513502, at *5 (citations omitted), Suber's allegations regarding her subjective feelings do not lend support to finding that she has asserted plausible constructive discharge claims.  Indeed, after construing the allegations of the first amended complaint in her favor under the relevant objective standard, id., at *2, Suber's allegations fail to "suggest or indicate such objectively intolerable working conditions that would compel a reasonable person to resign," id., at *5; see also Cramer v. Bojangles' Rests., Inc., Civil Action No. 2:10–CV–0159–RWS–SSC, 2012 WL 716176, at *15 (N.D. Ga. Feb. 8, 2012), adopted by 2012 WL 716028, at *1 (N.D. Ga. Mar. 6, 2012), aff'd, 498 F. App'x 885 (11th Cir. 2012) (per curiam) (unpublished).  Suber's allegations simply "do not present the type of situation in which the Eleventh Circuit has found a viable claim for constructive discharge." Boyle v. City of Pell City, 4:14-cv-01603-KOB, 2016 WL 4585926, at *11 (N.D. Ala. Sept. 2, 2016), aff'd, 866 F.3d 1280 (11th Cir. 2017) (removal of plaintiff from foreman position and requests for him to

inventory the shop and operate machinery were not circumstances so intolerable as to amount to a constructive discharge); see also Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1538-39 (11th Cir. 1987) (plaintiff who voluntarily quit because she felt as though she had been demoted by reassignment, as well as embarrassed and frustrated by being assigned to work under a supervisor she had trained, did not present a claim for constructive discharge); Wardwell v. Sch. Bd. of Palm Beach Cty., 786 F.2d 1554, 1556 (11th Cir. 1986) (per curiam) (reversing as clearly erroneous the district court's finding of sex-based constructive discharge where female plaintiff was passed over for promotion in favor of less experienced male and complained that she was over-burdened with work); Eginton v. Fla. State Univ., 111 F. Supp. 3d 1263, 1271-73 (M.D. Fla. 2015) (concluding that professor who alleged that she lost control over her curriculum and academic responsibilities and was limited in her coaching opportunities was not constructively discharged); Smith v. Burns Int'l Sec. Servs., No. 4:03-CV-182 (CDL), 2005 WL 1522606, at *5 n.11 (M.D. Ga. 2005) (reassignment to different shift was not constructive discharge); Rousselle v. GTE Directories Corp., 85 F. Supp. 2d 1286, 1293 (M.D. Fla. 2000) (mere dissatisfaction with work assignment is not constructive discharge).  In short, Suber's first amended complaint "fails to state a plausible claim for constructive discharge."  McWhorter, 2012 WL 2513502, at *5; see also Arrington v. Ala. Power Co., 769 F. App'x 741, 747 (11th Cir. 2019) (per

curiam) (unpublished); <u>Bentley v. Baker</u>, Civil Action No. 7:12–CV–132 (HL), 2013 WL 3106658, at *6 (M.D. Ga. June 18, 2013) (citation omitted) (finding plaintiff failed to state a plausible constructive discharge claim where she alleged that she was given less desirable tasks, had her work schedule changed, and was sent home after not being given any work to perform since these allegations "do not establish the objectively intolerable working conditions necessary to prove a constructive discharge" and she failed to allege that she "gave Defendants a reasonable chance to address or remedy the situation"). Accordingly, it is **RECOMMENDED** that defendants' motion to dismiss, [Doc. 20], be **GRANTED** as it pertains to Suber's constructive discharge claims.

### 2.   EPA Claims

Suber asserts claims against all defendants under the EPA. [Doc. 19 ¶¶ 142-48]. Defendants contend that Suber's EPA claims should be dismissed for failure to state any plausible claim. [Doc. 20 at 14-17]. The EPA prohibits gender-based discrimination in rates of pay to employees. 29 U.S.C. § 206(d); <u>Miranda v. B & B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1526 (11th Cir. 1992). Specifically, the EPA provides:

> No employer . . . shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of

41

which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]"

29 U.S.C. § 206(d)(1). "To plead an EPA violation, [] [Suber] must allege facts indicating 'that the employer paid employees of opposite genders different wages for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Poague v. Huntsville Wholesale Furniture, 369 F. Supp. 3d 1180, 1197–98 (N.D. Ala. 2019) (quoting Steger v. Gen. Elec. Co., 318 F.3d 1066, 1077–78 (11th Cir. 2003)). In other words, the jobs must be "substantially equal." Edwards v. Fulton Cty., 509 F. App'x 882, 886 (11th Cir. 2013) (per curiam) (unpublished) (internal marks omitted) (citing Arrington v. Cobb Cty., 139 F.3d 865, 876 (11th Cir. 1998)).

Defendants first contend that Suber "provid[es] no specific factual allegation whatsoever that either . . . Chisley or Watkins ever had any control over [Suber]'s compensation," as required to support an EPA claim against them as her employer, "or that Chisley ever acted directly or indirectly as [Suber]'s employer, for example, by taking any employment action against [her], or even concerning [Suber] herself." [Doc. 20 at 4 (citation and internal marks omitted)]. Defendants also argue that Suber has not alleged sufficient comparators to support her EPA claims. [Id. at 15]. Specifically, defendants point out that Suber fails to allege

comparators who have served in an interim position and who "have performed CNO duties in addition to COO duties." [Id. (citation omitted)].  Defendants assert that this omission precludes Suber from bringing a plausible EPA claim because "[Suber] necessarily split her worktime between performing CNO duties and COO duties, and thus did not perform either of those functions fulltime," [id.], whereas Suber's alleged comparators "never . . . split their efforts or their duties or their responsibilities between [the two positions]," [id. at 16 (emphasis omitted)]. Defendants also argue that "[Suber] fails to allege specific facts showing that her pay was 'less' than that of her comparators," as defendants point out that Suber was hired in January 2020 while Walker and Kent were in the COO position "during a different period – over various years from 2011 through 2019."  [Id. (citations omitted)].[14]

---

[14] Defendants also assert that "there is simply no way that [Suber] can truthfully plead under any circumstances that she was paid less than [] Baldwin" because "Baldwin was hired at an annual pay rate of $225,000," while "[Suber] was paid $200,000 annual salary as CNO plus a quarterly $10,000 stipend for assuming the Interim COO duties, which computes to an annual pay rate for [Suber] of $240,000."  [Doc. 20 at 16-17 (emphasis omitted)].  Accordingly, defendants argue that "[Suber] was paid at an annual rate [of] $15,000 more, not less than Baldwin." [Id. at 17 (emphasis omitted)].  However, the Court cannot consider these arguments based on facts not alleged in the first amended complaint when considering defendants' motion to dismiss.  Redding v. Tuggle, No. 1:05-cv-2899-WSD, 2006 WL 2166726, at *5 (N.D. Ga. July 31, 2006), adopted at *1.

Suber responds that her first amended complaint sufficiently alleges that defendants paid her less than Baldwin, Walker, and Kent to perform similar duties in jobs that "require[d] equal skill, effort and responsibility," namely the Interim COO/CNO position and under similar working conditions to those of the three male COOs.  [Doc. 26 at 23-24 (citations omitted)].  Suber contends that defendants' arguments amount to "nothing more than [their] apparent disagreement with the allegations," as Suber notes that defendants add facts about her alleged salary but fail to include information about the salaries of her comparators, which Suber points out also are not included in her first amended complaint.  [Id. at 24].  In addition, Suber asserts that despite defendants' arguments to the contrary, "labelling [] [her] as 'interim' does not change the similarity of the duties [between Suber, Baldwin, Kent, and Walker]," nor the analysis under relevant guiding standards, [id.], and thus, she contends that "at this stage of the litigation . . . [her] claim is [not] subject to dismissal," [id. at 25].

After carefully reviewing Suber's allegations and construing her well-pleaded allegations in her favor, Hishon, 467 U.S. at 73, Suber has not alleged sufficient facts to state a plausible claim for a violation of the EPA, see Arafat v. Sch. Bd. of Broward Cty., 549 F. App'x 872, 875 (11th Cir. 2013) (per curiam) (unpublished) (citation and internal marks omitted) (affirming dismissal where plaintiff plead a "conclusory and formulaic recitation of the elements," of an EPA

44

claim, but did not plead "the facts comparing her skill, effort, and responsibility levels to these younger males").  Suber alleges that she was paid less than both Kent and Walker "for performing similar duties to the duties performed" by both men, [Doc. 19 ¶¶ 81, 85], and that defendants paid her "a total compensation package less than the compensation package paid to Baldwin for performing similar duties to the duties [she] performed," [id. ¶ 78].  However, these are conclusory allegations, and noticeably missing from Suber's first amended complaint are factual allegations, like salary or other compensation information, to support Suber's claim that she was paid less than Kent, Walker, and Baldwin, which Suber herself confirms "is not stated in [her first] [a]mended [c]omplaint," [Doc. 26 at 24].  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Suber's] . . . obligation to provide the grounds of [her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555 (last alteration in original) (citations and internal marks omitted), and, it is well established that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to satisfy the relevant pleading standards at the motion to dismiss stage, Iqbal, 556 U.S. at 678 (citation omitted).  Here, apart from conclusory allegations regarding compensation, "[Suber] has not provided any allegations about the wages [of] . . .

45

any comparators," and thus, "[w]ithout this information, . . . [Suber] has not stated a claim under the [EPA]." Dubose v. SYSCO Corp., No. 1:10-CV-02952-WSD, 2011 WL 1004689, at *6 n.3 (N.D. Ga. Jan. 31, 2011), adopted by 2011 WL 1004675 (N.D. Ga. Mar. 18, 2011); see also Arafat, 549 F. App'x at 875; Poague, 369 F. Supp. at 1198 (granting motion to dismiss where plaintiff failed to allege facts indicating one element of an EPA claim).   Accordingly, it is **RECOMMENDED** that defendants' motion to dismiss, [Doc. 20], be **GRANTED** as to Suber's EPA claims. See Dubose, 2011 WL 1004689, at *6 n.3.

### 3.   Leave to Amend Complaint

In her response to defendants' motion to dismiss, Suber requests that the Court grant her leave to amend her first amended complaint should defendants' motion to dismiss be granted, see [Doc. 26 at 30-31], which defendants oppose, see [Doc. 20 at 15].   However, "filing a written motion that sets forth the substance of a proposed amendment is the proper method to request leave to amend a complaint," Johnson v. Boyd, No. 12–16181, 2014 WL 2523832, at *4 (11th Cir. June 5, 2014) (per curiam) (unpublished) (citation omitted), and thus, Suber's request for leave to amend is not properly made since she simply included this request in her response to defendants' motion, see [Doc. 26 at 30-31]; see also Long v. Satz, 181 F.3d 1275, 1279-80 (11th Cir. 1999) (citations omitted); Lord Abbett Mun. Income Fund, Inc. v. Tyson, 671 F.3d 1203, 1208 (11th Cir. 2012) (per curiam)

(finding no error where district court dismissed plaintiff's complaint without granting it leave to amend where the request for leave to amend appeared in its response to defendants' motion to dismiss). Moreover, Suber has already filed an amended complaint, and a further opportunity to amend is not warranted.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that defendants' motion to dismiss, [Doc. 20], be **GRANTED IN PART** and **DENIED IN PART**, such that Suber's constructive discharge claims under the ADEA, Title VII, and § 1981, her EPA claims, and her § 1981 race discrimination claim against Chisley be **DISMISSED**, but that her remaining claims against CTCA and Watkins based on her failure to be promoted to COO be allowed to proceed.

**IT IS SO RECOMMENDED** and **DIRECTED**, this 10th day of November, 2021.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE